IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| MONTANA PROFESSIONAL SPORTS, LLC, a Montana corporation, | ) ) ) | |
| PLAINTIFF, | ) ) | |
| v. | ) ) | Civil Action No.: 6:05-cv-1827-Orl-18DAB |
| LEISURE SPORTS MANAGEMENT, INC., a Florida corporation and NATIONAL INDOOR FOOTBALL LEAGUE, LLC, an Ohio corporation, | ) ) ) ) ) ) | |
| DEFENDANTS. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

This matter having come before the Court on January 24, 2006 on Plaintiff Montana Professional Sports, LLC's ("MPS") Motion for Preliminary Injunction, and the Court having considered the declarations, pleadings, memoranda and exhibits on file and the arguments of counsel, the Court hereby enters its Findings of Fact and Conclusions of Law, and enters the following Order:

## I. FINDINGS OF FACT

### A.   The Parties

1.      Defendant National Indoor Football League, LLC is the owner and operator of the National Indoor Football League (the "League"). The League consists of approximately twenty-four professional football teams located in fifteen different states, including Florida. The League playing season commences in March each year.  Shiver Aff. ¶¶ 3-7.

2.      MPS is the owner and operator of the BILLINGS OUTLAWS, a professional indoor football team located in Billings, Montana that plays in the League.  Austin Decl. ¶ 2; Shiver Aff. ¶ 13.

3.      Leisure Sports Management, Inc. ("LSM") is the owner and operator of the

OSCEOLA OUTLAWS, a professional football team located in Osceola County, Florida that plays in the League.  Doebler Aff. ¶¶ 2-3; Shiver Aff. ¶¶ 21-22.

**B.     History of the Outlaws Trademarks**

4.     In 2000, Duane Anderson acquired the right from the League to operate a professional football team in Billings, Montana as part of the League beginning with its inaugural 2001 season. Anderson Decl. ¶ 2; Shiver Aff. ¶¶ 3, 8-9.

5.     Mr. Anderson named his team the BILLINGS OUTLAWS and developed two logos for use in connection with the team.  Anderson Decl. ¶¶ 3-4.

6.     On January 24, 2001 Mr. Anderson filed three trademark applications in the U.S. Patent and Trademark Office to register the marks BILLINGS OUTLAWS (the "BILLINGS OUTLAWS Word Mark") and two design marks (collectively the "Outlaws Design Marks"). Based on those trademark applications, on February 25, 2003 Mr. Anderson was granted U.S. Registration No. 2,691,663 for the BILLINGS OUTLAWS Word Mark for use in connection with clothing and entertainment services, namely, professional football games and exhibitions; on February 15, 2005 Mr. Anderson was granted U.S. Registration No. 2,926,797 for one of the Outlaws Design Marks for use in connection with clothing and entertainment services, namely, professional football games and exhibitions; and on August 30, 2005, Mr. Anderson was granted U.S. Registration No. 2,990,181 for the other Outlaw Design Mark  also for use in connection with clothing and entertainment services, namely, professional football games and exhibitions (collectively the "Outlaws Marks").  Anderson Decl. ¶¶ 3-4; Rothwell Decl. Exs. A-C.

7.     Mr. Anderson operated the BILLINGS OUTLAWS under the Outlaws Marks for four consecutive seasons from the League's inaugural season through 2004.  Anderson Decl. ¶¶ 5, 12.

**C.     Consumer Recognition of the Outlaws Marks**

8.     The BILLINGS OUTLAWS were the subject of substantial and continuous advertising and promotion under the Outlaws Marks from 2001 through 2004.  Advertisements bearing the Outlaws Marks were published in newspapers, on the League's website, on the

BILLINGS OUTLAWS' website, and on roadside signage.  Anderson Decl. ¶¶ 12, 17-18.
Advertisements featuring the Outlaws Marks also aired on television and on the radio. *Id.* ¶¶ 12. 19-
20.  Additional promotional efforts included public appearances by "The Most Wanted," the
BILLINGS OUTLAWS' dancers, corporate sponsorships, participation in trade shows,
advertisements on buses, and a myriad of press releases and direct mailings to consumers. *Id.* ¶¶ 12-
16, 21-22. As a result, the Outlaws Marks are recognized throughout the League and elsewhere as
an indication of source for the BILLINGS OUTLAWS. *Id.* ¶ 25.

9.      The goodwill associated with the Outlaws Marks has also been strengthened by the
BILLINGS OUTLAWS' success on the football field since 2001. Approximately 100,000 fans have
purchased tickets and attended the BILLINGS OUTLAWS' games in Montana. Anderson Decl. ¶
5. Those fans were repeatedly exposed to the Outlaws Marks through advertisements at the venue,
the prominently displayed OUTLAWS design mark on the field. the branded merchandise offered
for sale. team uniforms and helmets worn by players, and programs which feature the Outlaws
Marks. *Id.* ¶ 23.

**D.     MPS' Acquisition of the BILLINGS OUTLAWS and the Outlaws Marks**

10.     In February 2005, Mr. Anderson had a dispute with the League and informed the
League that the BILLINGS OUTLAWS would not play in the upcoming season. Anderson Decl.
¶¶ 6-7; Shiver Aff. ¶¶ 10-12. Mr. Anderson always intended for the BILLINGS OUTLAWS to
resume play under the Outlaws Marks in 2006 either as part of the League or elsewhere. Anderson
Decl. ¶¶ 6, 9. Mr. Anderson also intended to continue and did continue the promotion and
advertisement of the Outlaws Marks and the promotion, advertisement and sale of related
merchandise during 2005. *Id.*, ¶¶ 6, 9-10.

11.     The League responded to Mr. Anderson's decision by terminating his contract, taking
control of the BILLINGS OUTLAWS and offering MPS the right to operate a team in Billings,
Montana as part of the League.  Anderson Decl. ¶¶ 6-7: Austin Decl. ¶ 2: Shiver Decl. ¶¶ 10-13.

12.     During the negotiations that followed between the League and MPS. the League

3

expressly informed MPS that it would have the right to use the Outlaws Marks during the 2005 season pursuant to the contract between Mr. Anderson and the League. Austin Decl. ¶ 3, Ex. A at 1, 3-4, 8; Shiver Aff. ¶ 14. The League also informed MPS that its contractual right to use the Outlaws Marks would be limited to the 2005 season unless MPS could purchase the Outlaws Marks from Mr. Anderson. Austin Decl. ¶ 3, Ex. A at 1. 3-4, 8; Shiver Aff. ¶ 14.

13.     MPS acquired the right to operate the team in Billings, Montana in March 2005, just before the start of the League's 2005 season. Austin Decl. ¶¶ 2-3; Shiver Aff. ¶ 13. MPS relied upon the League's representations that MPS could use the Outlaws Marks in 2005. Austin Decl. ¶ 4. Accordingly. MPS announced that its team would play as the BILLINGS OUTLAWS shortly after it acquired the team. *Id.*

14.     Mr. Anderson disagreed with the League's interpretation of their contract and threatened to sue MPS and the League for trademark infringement and seek an injunction if MPS used the Outlaws Marks. Anderson Decl. ¶ 7; Austin Decl. ¶ 5; Shiver ¶ 14. After investigating Mr. Anderson's claims, MPS recognized the strength of Mr. Anderson's rights in the federally registered Outlaws Marks and determined that it would be an act of infringement to use the Outlaws Marks without Mr. Anderson's authorization. Austin Decl. ¶ 6. MPS also recognized the tremendous marketing potential and goodwill associated with the Outlaws Marks and thus selected the BILLINGS MAVERICKS as a temporary team name for 2005 while negotiating with Mr. Anderson for the purchase of the Outlaws Marks. *Id.* ¶ 7.

15.     In October 2005. Mr. Anderson agreed to assign all rights to the Outlaws Marks to MPS and the parties executed an assignment agreement on November 10, 2005. Austin Decl. ¶ 11; Anderson Decl. ¶ 11.

16.     MPS promptly informed the League that its team would operate under the Outlaws Marks during the 2006 season and beyond at the League meetings in November 2005. Austin Decl. ¶ 12; Doebler Aff. ¶ 12; Shiver Aff. ¶ 25.

**E.**     **MPS' Operation and Promotion of the BILLINGS OUTLAWS Under the Outlaws Marks**

17.     MPS is currently operating, promoting and advertising the BILLINGS OUTLAWS under the Outlaws Marks. Austin Decl. ¶ 14. These efforts include the promotion and advertisement of the BILLINGS OUTLAWS on the team's website, which frequently refers to the BILLINGS OUTLAWS as the "Outlaws." Rothwell Decl. Ex. O at 1-4.

18.     MPS has already sold, and is continuing to sell, tickets for the upcoming 2006 League season under the Outlaws Marks. Austin Decl. ¶ 14.

19.     In addition, MPS has already sold, and is continuing to sell, branded merchandise under the Outlaws Marks, including but not limited to sweatshirts and hats. Austin Decl. ¶ 14.

20.     MPS has also formed, and is continuing to form, corporate sponsorship agreements under the Outlaws Marks for the 2006 League season. Austin Decl. ¶ 14.

21.     MPS has also been promoting its team under the Outlaws Marks through public appearances of players and the BILLINGS OUTLAWS' dancers, "The Most Wanted," and the distribution of branded merchandise at these appearances. Austin Decl. ¶ 14.

22.     MPS will sell tickets and branded merchandise under the Outlaws Marks through the BILLINGS OUTLAWS' website at www.billingsoutlaws.com, over the telephone, at retail stores and at the METRA Park Arena where the BILLINGS OUTLAWS play in Billings, Montana. Austin Decl. ¶ 15.

**F.    LSM's Acquisition of the KISSIMME KREATURES**

23.     On September 28, 2005, LSM purchased the KISSIMME KREATURES, a professional indoor football team in Florida that plays in the League. Doebler Aff. ¶¶ 2-3; Shiver Aff. ¶¶ 21-22.

24.     In an effort to improve the image for its newly acquired indoor football team, which had experienced some financial difficulties in the past, LSM adopted a new name for its team, the OSCEOLA OUTLAWS (the "Osceola Word Mark"), in late September 2005. Doebler Aff. ¶ 4; Shiver Aff. ¶ 23. LSM also created an accompanying design mark and helmet logo (collectively with the Osceola Word Mark, the "Osceola Marks"). Doebler Aff. ¶ 4; Rothwell Decl. Ex. M.

5

25.     The League approved LSM's adoption of the Osceola Marks in September 2005. Doebler Aff. ¶ 6; Shiver Aff. ¶ 23.

**G.     Defendants' Prior Knowledge of the Outlaws Marks**

26.     As demonstrated below, MPS' communications with Mr. Michael Domico demonstrate that both the League and LSM were aware of the federally registered Outlaws Marks and MPS' efforts to acquire the Outlaws Marks from Mr. Anderson before LSM decided to adopt the Osceola Marks.

27.     In early 2005, Mr. Domico was employed by the League as its Developmental Vice President, and in that capacity, Mr. Domico communicated with MPS starting in March 2005. Austin Decl., ¶¶ 9-10; Domico Aff. ¶¶ 2-4, 7-8. MPS explicitly informed Mr. Domico of the negotiations with Mr. Anderson to purchase the federally registered Outlaws Marks and MPS' intent to use the Outlaws Marks in 2006. Austin Decl.. ¶¶ 9-10; Domico Aff. ¶¶ 10-11.

28.     After his communications with MPS, Mr. Domico's position with the League was terminated on or about May 1, 2005. Domico Aff. ¶ 14. Mr. Domico then relocated to Florida and was hired by Anthony Pewonski, the prior owner of the KISSIMMEE KREATURES. *Id.* ¶¶ 15-16.

29.     After LSM's acquisition of the team from Mr. Pewonski in September 2005, and before announcing the name change from KISSIMMEE KREATURES to OSCEOLA OUTLAWS, LSM hired Mr. Domico as general manager for the team. Domico Aff. ¶¶ 17-25; Rothwell Decl. Ex. T at 2.

30.     Mr. Domico expressly informed his superiors at LSM that the team in Billings, Montana played as the BILLINGS OUTLAWS prior to the League's 2005 season. Domico Aff. ¶ 20. Mr. Domico also informed his superiors at LSM that the team in Billings, Montana played as the BILLINGS MAVERICKS during the League's 2005 season because of a dispute with the former owner over the rights to the name BILLINGS OUTLAWS. *Id.*

**H.     The Parties' Dispute**

31.     MPS immediately objected to LSM's adoption of the Osceola Marks once it learned

6

about the name change at the League meetings in November 2005. Austin Decl. ¶ 12; Doebler Aff. ¶ 12.

32.     Afterwards, MPS repeatedly urged both the League and LSM (collectively the "Defendants") to reconsider their plans to use the Osceola Marks. Austin Decl. Ex. D at 1-6 & 10-11. MPS expressly informed the Defendants that: (a) MPS owned the federally registered Outlaws Marks; and (b) consumer confusion is inevitable if the Billings Team and the Osceola Team compete under identical OUTLAWS marks in the same indoor football league. *Id.*: Rothwell Decl. Exs. D-E, G, I-J.

33.     During subsequent discussions. the League president conceded that it "will be a huge problem for the league" if the Billings Team and the Osceola Team compete under identical OUTLAWS marks in 2006. Austin Decl. Ex. D at 6. David Doebler, one of LSM's owners, made a similar concession, stating that, "I agree that it hurts the league having 2 Outlaws." *Id.* Ex. D at 8.

34.     The Defendants refused to adopt a different trademark for LSM's team despite MPS' repeated requests. Austin Decl. ¶ 12, Ex. D at 1-3, 6, 8; Rothwell Decl.. Exs. F, K. Instead, the Defendants started to promote and advertise LSM's team on the Internet and elsewhere under the Osceola Marks. Rothwell Decl.. Exs. L-M. These Internet advertisements frequently refer to LSM's team as the "Outlaws." advertise the sale of sweatshirts and hats that feature the OSCEOLA OUTLAWS design mark which will be available "soon!", and promote the team's dancers as "The Most Wanted." *Id.* Exs. L-M, U.

35.     As a result of the parties' dispute. the League has refused to identify or promote the BILLINGS OUTLAWS under the Outlaws Marks and removed the link to the BILLINGS OUTLAWS' website. www.billingsoutlaws.com, from the League's website. Austin Decl. ¶ 13, Ex. E at 5. The BILLINGS OUTLAWS is the only team in the League with a website that cannot be accessed through the League's website. Rothwell Decl. Ex. L at 1-2.

I.     **Unique Fact Pattern**

36.     The Court is unaware of any instances where two teams operated under the same trademark in the same professional football league. Moreover, no two teams in the National Football League. the National Indoor Football League, or the Arena Football League are using the same mark. Rothwell Decl.. Exs. L at 1-3, P at 4-5 & Q at 3-4.

## II. CONCLUSIONS OF LAW

**A.     MPS Is Entitled To a Preliminary Injunction**

### 1.     Preliminary Injunction Standard

37.     In the Eleventh Circuit, a party seeking injunctive relief must show:  (a) there is a substantial likelihood that the moving party ultimately will prevail on the merits at trial; (b) the moving party will suffer irreparable harm if it is not granted the injunctive relief: (c) the benefits the injunction will provide the moving party outweigh the harm it will cause the opposing party: and (d) issuance of the injunction will not harm public interests. *See Callaway v. Block*, 763 F.2d 1283. 1287 (11th Cir. 1985); *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983).

### 2.     General Application to a Trademark Case

38.     MPS' request for a preliminary injunction is premised on the Lanham Act, which protects both registered and unregistered trademarks from infringement.   The Lanham Act specifically provides that the federal courts may enjoin infringing activities. *See* 15 U.S.C. § 1116. Trademark actions, like the present one, are therefore "'common venues for the issuance of preliminary injunctions.'" *McDonald's Corp. v. Robertson.* 147 F.3d 1301, 1310 (11th Cir. 1998) (quoting *Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200. 1219 (N.D. Ga. 1995)).

39.     In trademark cases, the plaintiff's probability of success on the merits depends on the strength of its trademark infringement claim, which in turn requires a showing that the plaintiff's "mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake." *McDonald's Corp.*, 147 F.3d at 1307.  Once this showing is made, irreparable injury is presumed. *Id.* at 1310.

40.     An injunction against an infringing use almost always serves the public interest "by

8

avoiding the inevitable … confusion that would otherwise result." *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989). *See also Foxworthy*, 879 F. Supp. at 1219-20 ("[E]njoining illegal infringing activity serves the public interest."); *Clayton v. Howard Johnson Franchise Systems, Inc.*, 730 F. Supp. 1553, 1562 (M.D. Fla. 1988) ("[G]ranting the injunction will serve the public interest by preventing consumer confusion.").

41. Turning to the balance of hardships, this factor favors the plaintiff in a trademark case once it has demonstrated a likelihood of success on the merits. *Clayton,* 730 F. Supp. at 1561-62 (holding that a trademark owner will suffer irreparable damage if infringers are allowed to continue infringing its marks, while, in contrast, infringers "would suffer no legitimate harm since the preliminary injunction would only prevent them from using marks which they are not entitled to use."). *See also* Foxworthy, 879 F. Supp. at 1219.

**B.    MPS Is Likely To Succeed On the Merits**

42. MPS is likely to succeed on the merits of its claims against LSM and the League because MPS has shown that the Outlaws Marks are valid and that Defendants' activities likely infringe the Outlaws Marks. *Turner*, 320 F. Supp.2d at 1330 (citing *Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 906 (11th Cir. 2000)).

**1.    MPS' Federally Registered Outlaws Marks Are Valid**

43. MPS owns three federal trademark registrations which cover the Outlaws Marks: U.S. Trademark Registration Nos. 2.691,663. 2,926,797 and 2,990,181 (collectively the "Registrations").

44. The Registrations are prima facie evidence of the validity of the registered marks and of the registrations, of MPS' ownership of the marks, and of MPS' exclusive right to use the registered marks in commerce. *See* 15 U.S.C. § 1115(a).

45. LSM's argument that the Outlaws Marks have been abandoned lacks merit. Mr. Anderson consistently operated, advertised and promoted the BILLINGS OUTLAWS under the Outlaws Marks during the League's 2001, 2002, 2003 and 2004 seasons. During the stoppage of

play in 2005, Mr. Anderson continued to: (a) advertise and promote the Billings Team under the Outlaws Marks through roadside signage; (b) enforce the Outlaws Marks against potential infringers such as MPS through the threat of litigation; and (c) negotiate with MPS for the sale and assignment of the Outlaws Marks. Moreover, Mr. Anderson always intended for his team to resume play under the Outlaws Marks in 2006 and, after MPS' acquisition of the Outlaws Marks, the Billings team has been operated, advertised and promoted under the Outlaws Marks.

46.     Accordingly, MPS has satisfied its burden to show that it owns the Outlaws Marks and that the Outlaws Marks are valid.

2.     **There Is a Likelihood of Confusion Between the Parties' Marks**

47.     In determining likelihood of confusion, the Eleventh Circuit generally considers the following factors: (a) the strength of the plaintiff's mark; (b) the similarity between the plaintiff's mark and the accused mark; (c) the similarity between the products and services offered by the plaintiff and defendant; (d) the similarity of the sales methods; (e) the similarity of advertising methods; (f) the defendant's intent in using a trademark that is similar to the plaintiff's trademark; and (g) consumers' actual confusion. *Turner*, 320 F. Supp. at 1331-32 (citing *Alliance Metals*, 222 F.3d at 907).

48.     The factors are not rigidly weighed and are merely a guide for the Court to focus on the basic question: likelihood of confusion. *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542 (11th Cir. 1985).

49.     As demonstrated below, MPS has satisfied its burden to show the above factors weigh in favor of finding a likelihood of confusion.

(a)     The Outlaws Marks Are Strong

50.     Inherently descriptive marks, such as suggestive or arbitrary marks, are characterized by the Eleventh Circuit as "strong." *University of Georgia*, 756 F.2d at 1545. *See also Breakers of Palm Beach, Inc. v. International Beach Hotel Dev., Inc.*, 824 F. Supp. 1576, 1583 (S.D. Fla. 1993) ("A suggestive mark is considered 'strong' and entitled to protection without proof of secondary

10

meaning.") (citing *University of Georgia*, 756 F.2d at 1545).

51.     The Outlaws Marks are arbitrary when applied to the goods and services at issue,
namely, clothing and professional football games, because the marks do not describe or suggest
anything about those goods or services. *Breakers*. 824 F. Supp. at 1582-83 ("Arbitrary marks bear
no relationship to the product or service, for example, use of the term 'Apple' to sell computers.")
(citation omitted).   Contrary to LSM's argument, the use of a geographic term like "Billings" in a
composite mark such as BILLINGS OUTLAWS does not render the entire mark geographically
descriptive. *See* 2 *McCarthy on Trademarks and Unfair Competition*, § 14:11 (4th ed., 2005) ("If
a geographical term is combined with other elements to form a composite mark. the resulting
combination may not have any descriptive connotations. The total commercial impression created
by a composite mark may be merely arbitrary or suggestive even though some of its separate parts
may be geographically descriptive.").

52.     The Outlaws Marks are strong and entitled to broad protection. *Foxworthy*, 879 F.
Supp. at 1212 (Holding that inherently distinctive marks, such as suggestive marks, "are to be
afforded strong protection."); *Turner*, 320 F. Supp.2d at 1332 ("Strong marks are given strong
protection over a wide range of related products and services.").

53.     The advertising and promotion of the Outlaws Marks reinforces the conclusion that
they are strong and entitled to broad protection. *See Callaway Golf Co. v. Golf Clean, Inc.*, 915 F.
Supp. 1206, 1212-13 (M.D. Fla. 1995).

54.     The evidence of third party trademark applications and registrations submitted by
LSM does not reduce the strength of the Outlaws Marks because such applications and registrations
cover goods and/or services not related to football.

55.     The strength of the Outlaws Marks weighs in favor of finding a likelihood of
confusion.

(b)     The Parties' Marks Are Overwhelmingly Similar

56.     When assessing the similarity of the marks at issue, "a court must examine the overall

impression created by the marks, including appearance, sound, meaning and manner of display."
*Clayton*, 730 F. Supp. at 1559 (citing *Remy Martin*, 756 F.2d at 1533).

57.    The word OUTLAWS is the dominant portion of both MPS' BILLINGS OUTLAWS
word mark and LSM's OSCEOLA OUTLAWS word mark. The words BILLINGS and OSCEOLA
are descriptive geographic terms that offer little to alter the commercial impression of the marks at
issue. They should be discounted when the marks are compared for similarities. Thus, when viewed
in their entireties with the non-dominant features appropriately discounted, the overall impression
created by the respective OUTLAWS word marks is identical, including appearance, sound, and
meaning. *See In re Chatam Int'l, Inc.*, 380 F.3d 1340, 1342-44 (Fed. Cir. 2004) (holding that
appellant's JOSE GASPAR GOLD mark is "nearly identical" to registrant's GASPAR'S ALE mark
once the descriptive and non-dominant terms JOSE, GOLD and ALE are properly discounted).

58.    The manner in which the parties display their respective word marks strengthens the
conclusion that they are similar. Specifically, both LSM's website and the BILLINGS OUTLAWS'
website frequently promote the teams as the "Outlaws" without any use of the geographic terms
OSCEOLA or BILLINGS.

59.    The parties' OUTLAWS design marks are strikingly similar. The dominant portion
of MPS' federally registered design mark is the word OUTLAWS and a masked cowboy design.
Similarly, the dominant portion of LSM's design mark is the word OUTLAWS and a masked
cowboy design. Once the descriptive and non-dominant terms BILLINGS and OSCEOLA are
properly discounted for the reasons set forth above, the overwhelming similarities between the
design marks are manifest. *See University of Georgia*, 756 F.2d at 1544-45 ("[W]e find the
differences between the two [design marks] so minor as to be legally, if not factually, nonexistent.").

60.    A comparison of the parties' helmet logo design marks demonstrates that they are
strikingly similar as well. The dominant portion of both marks is a helmet featuring a masked
cowboy design.

61.    Accordingly, this factor weighs in MPS' favor with respect to both the word and

12

design marks at issue.

      (c)     The Parties' Goods and Services Are Identical

      62.     This factor favors MPS because MPS and LSM will provide identical goods and services as competitors in the League during the upcoming 2006 season. *Foxworthy*, 879 F. Supp. at 1213 ("This factor obviously supports plaintiff ... [because] [t]he litigants are competitors in the humorous t-shirt business.").

      63.     Both MPS and LSM will provide entertainment services in the nature of professional football games. Moreover, MPS already sells men's, women's and children's clothing, including sweatshirts and hats bearing the Outlaws Marks. LSM's website advertises sweatshirts and hats featuring its OUTLAWS design mark that will be available "soon!"

      64.     This factor, therefore, weighs in favor of finding a likelihood of confusion. *Turner*, 320 F. Supp.2d at 1332 ("The greater the similarity between the products, the greater the likelihood of confusion.").

      (d)     The Parties' Sales Methods Are Identical

      65.     "Another factor increasing the likelihood of confusion is a high degree of similarity between the parties' sales methods." *Turner*, 320 F. Supp.2d at 1332 (citing *Alliance Metals*, 222 F.3d at 907).

      66.     In this case, the parties' sales methods are identical. MPS will sell tickets and merchandise under the Outlaws Marks through its website (which was accessible through the League's website until MPS filed this lawsuit), over the telephone, at retail stores and at the stadium where the team will play. LSM will also sell tickets and merchandise through LSM's website (which is accessible through the League's website), over the telephone and at the stadium where the team will play.

      67.     Therefore, this factor weighs in favor of a finding of likelihood of confusion. *Turner*, 320 F. Supp.2d at 1332.

      (e)     The Advertising Methods Are Overwhelmingly Similar

68.     "If a plaintiff and a defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *Turner*, 320 F. Supp.2d at 1332-33 (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1542 (11th Cir. 1986)). "'The greater the similarity in advertising campaigns, the greater the likelihood of confusion.'" *Id.* (quoting *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp.2d 1261, 1267 (S.D. Fla. 1999)).

69.     Both teams are advertised extensively by the League on its website and through their respective team websites, both of which are normally promoted through the League's website.

70.     The BILLINGS OUTLAWS are also marketed through corporate sponsorships, public appearances by the team's dancers, and advertisements in newspapers, on television, radio and roadside signage. LSM's team is, or will be, utilizing identical advertising methods during the 2006 season.

71.     Thus, the advertising methods are the same and this factor weighs in favor of a finding of likelihood of confusion. *Turner*, 320 F. Supp.2d at 1332-33.

72.     There are no two teams in the National Football League, the National Indoor Football League, or the Arena Football League using the same mark at the same time let alone two teams using the same mark within the same league. None of the aforementioned professional football leagues has faced the likely confusion at issue in this case, namely, the prospect of two teams being promoted under identical marks in the same media. Therefore the unique facts of this case strengthen the conclusion that the parties' similar advertising methods as competitors within the League support a finding of likelihood of confusion.

(f)     The Defendants Had Knowledge of the Outlaws Marks

73.     "If the defendant adopted the plaintiff's mark with the intent of obtaining benefit from the plaintiff's business reputation, 'this fact alone may be sufficient to justify the inference that there is a confusing similarity.'" *Turner*, 320 F. Supp.2d at 1333 (quoting *Carnival Corp.*, 74 F. Supp.2d at 1268).

74.     Mr. Domico's express knowledge of the federally registered Outlaws Marks before,

14

during and after his employment with the League and LSM and the name change from KISSIMMEE KREATURES to the OSCEOLA OUTLAWS, demonstrates that the Defendants had knowledge of the Outlaws Marks and acted in bad faith when they adopted the confusingly similar OSCEOLA OUTLAWS marks.

75.    At the very least, the Defendants were "willfully blind" to MPS' rights, which also supports a finding of bad faith. *See Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476-77 (11th Cir. 1991) (Holding that willful blindness can provide the requisite intent or bad faith).

76.    Defendants' recent promotion of the Osceola team's dancers in connection with the mark MOST WANTED strengthens the conclusion that Defendants acted in bad faith because the BILLINGS OUTLAWS have always promoted their dance team as "The Most Wanted."

77.    Therefore, this factor favors a finding of likelihood of confusion.

(g)    Actual Confusion Is Likely

78.    MPS has not presented any evidence of actual confusion. However, this factor does not weigh heavily against MPS because evidence of actual confusion is not required to demonstrate a likelihood of confusion in the Eleventh Circuit. *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1547 (11th Cir. 1984) (Affirming the district court's decision in finding a likelihood of confusion where "plaintiff failed to prove actual confusion"); *Foxworthy*, 879 F. Supp. at 1214 (Noting that "evidence of actual confusion is not required" for plaintiff to prove its infringement case).

79.    The lack of actual confusion evidence is understandable in this case given Defendants' recent adoption of the confusingly similar OSCEOLA OUTLAWS marks in connection with the Osceola team. In fact, LSM's team has not yet played a single game under the OUTLAWS marks. Even the League president sees this as a ridiculous situation, stating that it "will be a huge problem for the league" if the BILLINGS OUTLAWS and the Osceola team compete under identical OUTLAWS marks in 2006.

## C.   MPS Is Suffering Irreparable Harm

80.     Once a plaintiff in a trademark infringement case establishes a likelihood of confusion, irreparable harm is presumed. *Foxworthy*, 879 F. Supp. at 1219 (When a plaintiff makes a *prima facie* showing of trademark infringement, "irreparable harm is ordinarily presumed."). *See also McDonald's Corp.*, 147 F.3d at 1310 ("[T]his Circuit has held that 'a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of … [a] substantial threat of irreparable harm.'") (quoting *Remy Martin*, 756 F.2d at 1530); *Power Test*, 754 F.2d at 95 (Irreparable harm exists in a trademark case when the moving party "shows that it will lose control over the reputation of its trademark pending trial.").

81.     The irreparable harm to MPS is also evidenced by the damage Defendants are doing to MPS' marketing revenue. Without the injunctive relief requested by MPS, consumers that find the OUTLAWS marks to be appealing and decide to purchase branded merchandise will be faced with the option of purchasing such merchandise from either MPS or LSM. Thus, MPS will lose sales of OUTLAWS merchandise to LSM, and MPS' federally registered Outlaws Marks will be diluted.

82.     MPS' attempts to negotiate sponsorships or a television deal will be complicated by the fact that its team will be one of two teams playing as the OUTLAWS. This lack of exclusivity undermines MPS' marketing since it will appear that MPS does not control its federally registered trademarks.

83.     The League's ongoing refusal to identify the BILLINGS OUTLAWS under the Outlaws Marks is also causing MPS to suffer irreparable harm. Fans who visit the League's website looking for the BILLINGS OUTLAWS are informed that the team in Billings, Montana is playing as the BILLINGS MAVERICKS while the Osceola team is playing as the OSCEOLA OUTLAWS. This misinformation is diluting the strength of the Outlaws Marks while causing damage to the goodwill and customer recognition associated with the Outlaws Marks.

84.     The League's decision to take down the link to the BILLINGS OUTLAWS' website

16

has put the BILLINGS OUTLAWS in the unenviable position of being the only team in the League with a website that cannot be accessed through the League's website. This lack of access will lead to fewer fans visiting the BILLINGS OUTLAWS' website with a correlating decline in promotional and sales opportunities for the BILLINGS OUTLAWS.

85.     Accordingly, this factor favors MPS in light of the likelihood of confusion established above.

**D.     The Balance of Hardships Weigh In Favor of Granting Injunctive Relief**

86.     This factor also favors MPS since it has demonstrated a likelihood of success on the merits.

87.     Granting the injunctive relief requested by MPS will only serve to protect MPS' trademark rights while stopping Defendants' infringing activities. *See Clayton*, 730 F. Supp. at 1562 (Holding that trademark owner will suffer irreparable damage if infringers are allowed to continue infringing its marks, while, in contrast, infringers "would suffer no legitimate harm since the preliminary injunction would only prevent them from using marks which they are not entitled to use."). *See also Foxworthy*, 879 F. Supp. at 1219 ("Issuing the injunction, however, will harm defendants only to the extent that they cannot sell illegally infringing t-shirts ... [t]his factor favors plaintiff.").

88.     The balance of hardships favors MPS because of the goodwill associated with the Outlaws Marks. The Outlaws Marks have been extensively used, promoted and advertised since 2001, including four complete League seasons where the Billings team played as the BILLINGS OUTLAWS. This goodwill will be harmed if Defendants are allowed to adopt and promote LSM's team under the confusingly similar OSCEOLA OUTLAWS trademarks.

89.     In contrast, LSM's team has not played a single game as the OSCEOLA OUTLAWS. Defendants have not presented any specific evidence of monetary harm. Moreover, any recent investment in the OUTLAWS name and marks by Defendants with full knowledge of MPS'

17

federally registered Outlaws Marks should not be afforded any weight.

**E.      An Injunction Will Serve the Public Interest**

90.      An injunction against an infringing use almost always serves the public interest "by avoiding the inevitable … confusion that would otherwise result." *Tally-Ho*, 889 F.2d at 1029. *See also Foxworthy*, 879 F. Supp. at 1219-20 ("[E]njoining illegal infringing activity serves the public interest."); *Clayton*, 730 F. Supp. at 1562 ("[G]ranting the injunction will serve the public interest by preventing consumer confusion."). The intellectual property interest of MPS is protected by obtaining a federal trademark. If the trademark is not enforced, the well-founded public trust in the trademark is diluted.

91.      Accordingly, this factor favors MPS as well.

### III. CONCLUSION

92.      MPS' Motion for Preliminary Injunction is GRANTED for the reasons set forth above.

### IV. ORDER

93.      The Court having reviewed MPS' Motion for Preliminary Injunction, the pleadings in this case and LSM's Opposition thereto, and having heard arguments of counsel, hereby orders and decrees, pursuant to Rule 65 of the Federal Rules of Civil Procedure, that Defendants LSM AND THE LEAGUE, their officers, agents, servants, employees, and attorneys, and all those acting in concert or participation with them who receive actual notice of this Order by personal service or otherwise are hereby preliminarily enjoined from:

(a)      using the trademark OUTLAWS and/or any other trademark which incorporates MPS' OUTLAWS mark in connection with the importation, promotion, advertisement, display, marketing, sale, offering for sale, manufacture, production, circulation or distribution of any product or service, including but not limited to professional football games and exhibitions, and men's, women's and children's clothing, in any media, including but not limited to the Internet, other than to promote or refer to MPS and its goods or services, including but not limited to professional

18

football games and exhibitions, and men's, women's and children's clothing;

(b)     using design marks that feature a masked cowboy or any other trademark which incorporates MPS' design marks in connection with the importation, promotion, advertisement. display, marketing, sale, offering for sale, manufacture, production, circulation or distribution of any product or service, including but not limited to professional football games and exhibitions, and men's, women's and children's clothing, in any media, including but not limited to the Internet, other than to promote or refer to MPS and its goods or services, including but not limited to professional football games and exhibitions, and men's. women's and children's clothing:

(c)     using any false designation of origin or false description, including. without limitation, the mark OUTLAWS and/or any design mark that features a masked cowboy, in any manner which is likely to lead members of the trade or public to believe that any product or service manufactured. advertised, marketed. distributed, sold or provided by LSM is in any manner associated or connected with MPS, or is sold, manufactured, licensed. sponsored, provided, approved or authorized by MPS:

(d)     transferring, consigning, selling, shipping or otherwise moving any goods, packaging or other materials in DEFENDANTS' possession, custody or control bearing a mark or design substantially similar to MPS' OUTLAWS word or design marks;

(e)     engaging in any other activity constituting unfair competition with MPS or constituting an infringement of any of MPS' marks; and

(f)     instructing, assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a)-(f) above.

94.     It is further ordered that Defendant LSM shall recall from its retail customers all products not yet sold bearing the mark OUTLAWS and/or a design mark featuring a masked cowboy. such products to be retained by LSM until after trial of this matter.

95.     It is further ordered that MPS shall post bond in the amount of $200,000 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

96.     This Order shall remain in place until the trial of this matter or further order of the Court.

IT IS SO ORDERED.

Date: _Feb 7 2006_

By: _____
The Honorable G. Kendall Sharp
United States District Judge